ESTATE OF GOLDIE C. BROWN, Deceased, VIRGINIA HASH, Executrix and Personal Representative, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Brown v. Commissioner
Docket No. 8022-75.
United States Tax Court
T.C. Memo 1977-85; 1977 Tax Ct. Memo LEXIS 355; 36 T.C.M. (CCH) 375; T.C.M. (RIA) 770085; March 29, 1977, Filed Frank B. Campbell, Jr., and Gary L. Stuart, for the petitioner. Gregory A. Robinson, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency of $252,433.25 in petitioner's Federal estate tax. The only issue for decision is the value on April 22, 1971, the date of decedent's death, of an undivided one-quarter interest in The DC Ranch Company, a partnership, the principal asset of which was unimproved real estate located near Scottsdale, Arizona. FINDINGS OF FACT Decedent, Goldie C. Brown, a resident of Scottsdale, Arizona, died on April 22, 1971. Virginia Hash (hereinafter referred to as Hash), executrix of decedent's estate, filed *356 the Federal estate tax return with the Internal Revenue Service Center at Ogden, Utah. At the time the petition was filed, Hash was a legal resident of Phoenix, Arizona.
Decedent died possessed of an undivided onequarter interest in a partnership known as The DC Ranch Company (hereinafter the DC Ranch partnership or the partnership), which had been formed on July 6, 1955, between E. E. Brown, Goldie C. Brown's deceased husband, and Kemper Marley. Immediately prior to Goldie C. Brown's death, the partners in the DC Ranch partnership were Kemper Marley (one-half undivided interest), the estate of E. E. Brown (one-quarter undivided interest), and Goldie C. Brown (one-quarter undivided interest). The principal asset of the DC Ranch partnership was unimproved real estate, consisting of approximately 18,700 acres of fee-owned land (hereinafter the DC Ranch property or the property) located north of Scottsdale, Arizona. The partnership also held grazing leases on approximately 19,400 acres of land owned by the State of Arizona and had about $347,000 in excess liabilities over other assets on the date of decedent's death. The 19,400 acres of land over which the DC Ranch partnership *357 held grazing leases (approximately half of which were east of the DC Ranch property and approximately half of which were west of that property) serve to connect or tie together the fragmented, irregularly shaped parcels comprising the main body (hereinafter sometimes referred to as the primary holding) of the DC Ranch property, with the exception of 8 noncontiguous parcels, 6 of which are to the southwest of the primary holding. On April 22, 1971, approximately 15,700 acres of the 19,400 acres leased by the partnership were held under a lease due to expire on June 30, 1972; the balance was held under leases due to expire on June 30, 1974.The leases were renewable. The value of the leasehold property as of April 22, 1971, was approximately $50,000. The DC Ranch property is approximately 13 miles in length from north to south and approximately 8 miles wide. It is somewhat checkerboard in pattern in that it is not a single connected block of land. The topographic characteristics of the property are as follows: 30.3 percent is relatively flat desert terrain; 24.8 percent is gently rolling desert land; 9.4 percent is foothill land; and 35.5 percent is steep and rough mountainous *358 terrain. The largest contiguous block of land is in the mountains. The major portion of the DC Ranch property lies above a granite base which makes the development of ground water difficult and costly. The privately owned water company serving this area was inadequate at the time of decedent's death to support development of most of the property. However, considering the entire DC Ranch property, the best possibility for development of a reliable source of water existed on one or more of the 6 small, noncontiguous parcels to the southwest of the primary holding. The DC Ranch property is situated approximately midway between Carefree, Scottsdale, and Fort McDowell, Arizona. Downtown Phoenix is 11 miles west and 14 miles south of the property, while the main part of Scottsdale is 10 miles south and 2 miles west of the main body of the property. The prestigious residential areas of Carefree, Paradise Valley, and northern Scottsdale are near the 6 small, noncontiguous parcels of the DC Ranch property isolated to the southwest of the main body of the property. Scottsdale grew from a population of 10,026 as recorded in the 1960 census to 67,823 in the 1970 census, this growth *359 being primarily to the north toward the DC Ranch property. Scottsdale's growth in the 10 years prior to April 22, 1971, reflected the largest percentage increase of any city or town in Arizona. The fair market value on April 22, 1971, of the DC Ranch property, if it could have been sold in its entirety on that date forimmediateuse, was approximately $13 million. However, due to its large size, lack of water, variety of terrain, and fragmentation, the property could not be marketed in such a manner.The best use to which the property could be put so that it would yield the highest return over a period of time was as a master planned community. Because of the surrounding communities' growth toward the DC Ranch property, as of April 1971 the property as a whole was approaching a period of potential development as a master planned community. However, because of the substantial risks involved in development arising from its large size, lack of water, undesirable shape, and other problems, any purchaser would have demanded a substantial return on his investment to offset holding costs and would have expected a lengthy sellout period. A 10-percent-per-year discount *360 was a conservative estimate as of April 1971 of the rate to be applied to reduce the present value of the property. From the standpoint of the property's best use potential, the 6 isolated, noncontiguous parcels immediately north of Scottsdale (and to the southwest of the primary holding) were readily marketable by themselves as of the date of decedent's death. The fair market value of these 6 parcels as of April 22, 1971, was approximately $2,100,000.However, before the rest of the DC Ranch property could have begun to be marketed as a planned community, a lead-in period of approximately 2 years would have been necessary to formulate the master plan, develop the land, and gain Federal, State, and local approval. There were several master planned communities that essentially surrounded, yet were not contiguous to, the DC Ranch property. Having been developed from purchases of contiguous land of smaller size than the DC Ranch property and having had a more readily available source of domestic water, each of these developments was comprised of more desirable land than the subject property. The Carefree development, located northwest of the DC Ranch property, was commenced during *361 the 1950's and was still being developed and marketed as of the date of the trial in the instant case. The Sun City development located northwest of Phoenix, Arizona, was begun in 1960, and at the time of the trial of this case--16 years later--the original purchased land had not been entirely marketed. The Lake Havasu City project, located on Lake Havasu on the Colorado River, was originally purchased by McCulloch Properties, Inc., in 1962, and after 14 years that land had not been sold out. The Fountain Hills development, which touches the southeast corner of the DC Ranch property, was begun in 1968, and at the date of trial, less than one-half of the original purchase had been sold out. Based on the actual marketing periods of these planned developments, a purchaser of the DC Ranch property could have expected, after an approximate 2-year leadin time, at least a 15-to-20-year marketing period for complete development and sale of all the property as a master planned community.
The sellers of the Sun City and Fountain Hills properties referred to above did not sell their properties outright but, rather, retained some interest or participation with the developer-buyer in the properties. *362 The Sun City sales agreement called for the property to be released over a 20-year period. However, the seller retained the right to farm the land, thereby having had income over the term. Also, he obtained a 49-percent interest in the development company. With respect to the Fountain Hills property, in 1968 the purchasers bought a part of that property and obtained an option on the remainder, which was exercisable within 6 years and was actually exercised after 4 years. After the death of E. E. Brown on October 4, 1966, Goldie C. Brown's claim to a one-quarter undivided interest in the DC Ranch property was in question. On September 25, 1970, a court settlement was made, giving her an undisputed right to that portion of the property. At the time of decedent's death, Kemper Marley was executor of the estate of E. E. Brown. Marley had the contractual power of management of the partnership which did not expire until October 1972. Thus, on the valuation date, Goldie C. Brown held a minority interest in the partnership, the other three-quarters being owned or controlled by Marley. Kemper Marley is a well-known, wealthy businessman, who has engaged in much litigation. His *363 tremendous wealth and local influence placed a partner with a minority interest at a distinct disadvantage. Marley had been desirous of partitioning the property since the death of E. E. Brown in 1966 and, subsequent to Goldie C. Brown's death, instituted partition proceedings against her estate. John T. Hansen, M.A.I. (hereinafter Hansen), who appraised the DC Ranch property on behalf of petitioner, and Wendell L. Montandon, M.A.I. (hereinafter Montandon), who appraised the same property for respondent, are both highly qualified experts in the field of real estate appraisal, with substantial experience in Arizona properties. Both experts appraised the property by the use of the comparable sales method. In the Federal estate tax return filed by the estate of Goldie C. Brown, the value of petitioner's one-quarter interest in the DC Ranch partnership was listed as $1,143,567.49. In his statutory notice of deficiency, respondent determined a value of $1,983,313 for that portion of the partnership property in question. OPINION Section 2031(a) of the Internal Revenue Code *364 of 1954, as in effect on the date of decedent's death, provides as follows: The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated. For purposes of section 2031(a) of the Internal Revenue Code, "value" means "fair market value," i.e., "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. At the trial of the instant case, each side to the dispute presented an expert witness who had independently appraised the 18,700-acre, fee-owned DC Ranch property and 19,400-acre grazing leases by using the comparable sales method. Hansen, petitioner's appraiser, valued decedent's partnership interest, the principal asset of which was the subject property, at $1,143,567.49 as of April 22, 1971; Montandon, respondent's appraiser, set the value at $1,983,313. We find the value of decedent's one-quarter interest *365 in the DC Ranch partnership was $1,360,000 on April 22, 1971. If the DC Ranch property could have been sold on April 22, 1971, in its entirety and for immediate use, the basic acreage value based on market comparison was approximately $13 million. [1]/ But since the property was unique due to its size, terrain, water problems, and fragmentation, it could not be sold in this way. Both experts testified that the best way to market the property was to develop it as a master planned community. They agreed that, because of the great risks involved in development of the property, a purchaser's offering price would reflect a discount to offset carrying costs, and they settled on a conservative 10-percent-per-year rate, taking into account the possibility of future appreciation of the *366 property to be developed and sold at some point in the future. There remained, however, fundamental disagreement as to the number of years over which the $13 million valuation figure should be discounted. Petitioner's appraiser argues that at least a 2-year lead-in period of planning, engineering, and other development activities would be required before a purchaser could begin to market any of the property as a master planned community and estimates that, after this 2-year time, it would take 15 to 20 years, or an average of 17 years, to market the entire property as a development. Respondent's appraiser concludes that it would take at least 19 years to market the DC Ranch property as a master planned community. He nevertheless expresses the opinion that a 19-year sellout period is not decisive in arriving at the price which a purchaser of the property would pay. He argues that the 6 small, nontiguous parcels located to the southwest of the main body of the DC Ranch property were marketable immediately on the valuation date and, as to the primary holding itself, he assigns an 8-year discount period, reasoning that a hypothetical buyer would purchase an 8-year option which *367 could be exercised in four equal installments over the 8 years. Further, his theory contemplates that a seller would want to retain some interest or participation in the future retail sales throughout the 19-year marketing period and that the original purchaser of the property would resell major segments within the 8-year option period to keep his costs to a minimum.
Petitioner and respondent adopted the reasoning and conclusions expressed in their respective appraiser's report. We think that, except for respondent's point concerning the immediate marketability of the 6 small, noncontiguous parcels, petitioner has the better side of the argument. Respondent's expert was influenced by the terms or conditions of sale of the Fountain Hills and Sun City properties, each located near the DC Ranch property. In the Fountain Hills transaction, the purchasers obtained a 6-year option to buy the remainder of the property and exercised that option after only 4 years. In the Sun City transaction, although the sales agreement called for the property to be marketed over a 20-year period, the seller retained the right to farm the land and participate in future retail sales of the subject *368 property. Respondent's 8-year discount period, relying on the Fountain Hills transaction, is based not on a sale of the property as of the valuation date but, rather, on an option to purchase the property. We think this approach unnecessarily complicates our basic inquiry -- that is, in a sale outright of the DC Ranch property on April 22, 1971, at what price would the property change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having knowledge of the unusual characteristics of the property? In this context, respondent significantly overstates the offering price by hypothesizing an option rather than an outright purchase and an 8-year discount period during which the original buyer would resell major portions of the property to other purchasers. Relying on the Sun City transaction, respondent suggests that if petitioner did not sell the property in its entirety on April 22, 1971, but, rather, retained some interest or participation in future retail sales, in the long run the property would be more valuable to the estate. This is no doubt true, but the argument once again misconceives the valuation task before *369 this Court. We do not think the estimated value of the DC Ranch property on April 22, 1971, should be inflated to reflect some future value which petitioner would be entitled to only if it did not sell the property. The facts confirm that petitioner's assignment of a 17-year marketing period after a 2-year planning period is reasonable for most of the property. The developments surrounding the DC Ranch property, all from purchases of more desirable land, show initial planning and development periods in which no sales were made and marketing periods of extended length. Most of the DC Ranch property was without present sources of water, and a considerable length of time would be needed to solve this problem. Also, due to the unusual shape and fragmented nature of the most desirable portion of the primary holding, it is quite conceivable that intervening parcels would need to be purchased before any extensive development could be undertaken. However, with respect to the 6 noncontiguous parcels to the southwest of the main body of the DC Ranch property, we think that, due to their location in an attractive area of increasing sales activity and since they provided the best area *370 of the entire property for development of a reliable source of water, they were individually separable from the main body and were readily marketable as such on April 22, 1971. We further think that the sale of these individual parcels would not hamper or detract from the sale of the primary holding or its development. The fair market of these parcels was $2,100,000 [2]/ on April 22, 1971, and this figure should not be discounted. Taking all the evidence into account -- the ownership of the land by a partnership in which decedent held only a minority interest [3]/; the unique characteristics of the large block of land; the necessity of developing the land as a planned community in order to sell it; the risks, problems, capital required, and time period involved in developing and marketing most of the property; the immediate marketability of the 6 noncontiguous parcels; and other factors -- we find that the value of decedent's one-quarter interest in the DC Ranch partnership on the date of her death, April 22, 1971, was $1,360,000. *371 To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. /↩ Hansen, in his appraisal report, divides the DC Ranch property into 43 parcels, analyzing the separate categories of the property, and concludes that the total acreage value was $13,005,000. In his report, Montandon also divides the property up into separate parcels, to which he assigns per-acre values, and thus concludes that the DC Ranch property had an acreage value of $13,121,000.
2. /↩ Hansen's appraisal found the fair market value of these 6 parcels to be $2,110,000; Montandon's appraisal set the figure at $2,066,000.
3. /↩ Both appraisers' reports agree that a discount of at least 10 percent on a one-quarter minority interest in the DC Ranch partnership should be made to account for the disadvantages of a minority status. However, respondent argued at trial that since the appraisers did not know that the majority owner, Kemper Marley, was willing to partition the property, the 10-percent figure should be reduced. We see no reason to think that Marley, though amenable to partitioning, would not vigorously pursue his own interests to the fullest in any litigation to partition the property.